The **AMERICAN BASKETBALL ASSO-CIATION, Plaintiff,**

v.

**AMF VOIT, INC. and AMF Incorporated, Defendants.**

No. 72 Civ. 2922.

United States District Court,
S. D. New York.

March 5, 1973.

As Amended March 16, 1973.

Alfred Musumeci, and Regan, Goldfarb, Powell & Quinn, New York City, for plaintiff; Francis J. Purcell, Martin Heller, Howard Breindel and Jan Atlas, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for defendants; Mercer L. Stockell, James B. Swire, E. Carrington Boggan and Steven Naclerio, New York City, of counsel.

## OPINION

DUFFY, District Judge.

This is a motion for a preliminary injunction to prevent the alleged infringement of an alleged trademark owned by the plaintiff. Various claims of unfair competition are also charged.

A five day hearing was held on this motion and included the reception of many depositions which the Court read *in camera*. A number of physical exhibits were also received in evidence, although the Court refused to admit the ten large crates of physical exhibits, consisting of various items of multicolored sports equipment, offered by defendants. Instead, descriptions of rep-

resentative samples of the proffered exhibits were dictated into the record.

Plaintiff has also moved to consolidate the hearing on the preliminary injunction with the trial of the permanent injunction, proposing that the question of damages, if any, be decided in a separate hearing held subsequent to this decision.

Defendants have vigorously opposed both motions.

The plaintiff, American Basketball Association (hereinafter referred to as "ABA") is a professional basketball league formed in 1967, and is in competition with the much older National Basketball Association. The defendant AMF Voit, Inc. is a manufacturer of various sporting goods, including basketballs, and is a wholly owned subsidiary of the other defendant, A.M.F., Incorporated (both defendants are hereinafter referred to as "A.M.F.").

When the ABA was formed, its first Commissioner, George Mikan, determined that the new league would have to have a "gimmick" to differentiate it from the older established National Basketball Association. Among other things, it was decided that a multicolored basketball could be one such "gimmick".

Until this time, all official basketball games, whether professional or scholastic, had been played with a leather ball consisting of eight tan leather panels affixed to an underlying bladder in a particular sequence. The ABA did not change the size of the ball or the shape of the leather panels but proposed that the uniformly tan panels be changed by dyeing the leather to produce a red-white-blue-white-red-white-blue-white combination. It was thought that this would be more appealing to women and more attractive on color television.

Various manufacturers were contacted and the successful bidder, Rawlings Sporting Goods Company ("Rawlings") produced a red, white and blue ball and also a yellow ball for inspection by Mr. Mikan, the Commissioner of the ABA and various other league officials. They took these balls to the local Minneapolis TV station. (The headquarters of the league was located in Minneapolis, which was also Mr. Mikan's hometown.) The balls were tested on closed circuit TV, particularly to see if the red, white and blue ball would produce "trailers" on color TV receivers. Apparently, no difficulty was found with the use of the red, white and blue ball on color TV.

It was then finally decided that the league would adopt the red, white and blue basketball and require its use in all official league games. In all of its publicity thereafter and in all of the publicity for the various league teams, the red, white and blue basketball was prominently displayed. Indeed, even now, all nationally televised ABA games are introduced with a short film (or more properly a video-tape), which pictures the red, white and blue basketball.

This Court finds that the real impetus behind the use by the ABA of the red, white and blue basketball came from George Mikan, the first Commissioner of the ABA. In his deposition, Mr. Mikan said that he had a recollection of seeing multicolored basketballs used for practice on pre-game warmups, prior to the advent of the ABA. He denied, however, ever seeing a red, white and blue basketball as such and specifically denied ever seeing a red, white and blue basketball manufactured for the Hutch Athletic Goods Company and supposedly distributed for sale in the Minneapolis area prior to the advent of the ABA.[1]

As indicated above, the Rawlings Company was commissioned to manufacture the ball actually used in all league

---

1. It is unnecesary for this Court to find whether, in fact, the Hutch Athletic Goods Company had had red, white and blue basketballs manufactured for it prior to 1967, much less whether such balls were distributed or offered for distribution in the Minneapolis area.

games. Each such ball contains the ABA logo along with the Rawlings logo.

As a "promotional stunt", however, the various teams of the ABA, at the inception of the league, had "ball nights" wherein a patron who attended the league game on a particular night would receive a promotional red, white and blue basketball as a souvenir.[2] These promotional balls were originally supplied by Wilson Sporting Goods Company ("Wilson"). These balls were purchased by the teams through the league office and were apparently made of inferior "rubber" or vinyl. These promotional balls also showed the ABA logo along with the Wilson logo. The Wilson promotional basketballs apparently were not suited to playground use and would bulge out of shape. After a couple of years, the ABA dropped this source of supply for promotional balls.

During this period, the league teams apparently were experiencing some difficulty in obtaining these balls. For example, the New York Nets, an ABA team, had manufactured for promotional purposes a red, white and blue ball identical to the league's game ball, which bore only the logo of the New York Nets.

In any event, it is clear that after the advent of the ABA, many companies began selling red, white and blue basketballs without the ABA logo but carrying the logo of the manufacturer and/or distributor. These companies included Hutch Athletic Goods Company, Regent Sporting Goods Company, Pennsylvania Rubber Company, MacGregor Co. and Spalding Co.

When the ABA originally used its red, white and blue ball, Commissioner George Mikan asked a patent lawyer to take steps to assert a design patent right over the coloration. Apparently nothing came of this approach. The ABA thereupon applied for a copyright for the coloration of the basketball. This application was rejected.

On March 15, 1971, an application for the trademark in question in this action was filed with the Patent Office by the plaintiff. Almost a year later, on February 22, 1972, the trademark was published in the Official Gazette of the United States Patent Office. Subsequently, four separate oppositions to registration of the trademark were filed, including one by the defendants, AMF.[3]

On its part, AMF points out that it felt competitive forces and pressures from its sales force which led to its manufacturing and marketing and then distributing red, white and blue basketballs starting in about November 1970. This ball was catalogued by AMF as "WBR" ball. In the initial Research and Development Order and in the initial Production Order, the officials of AMF referred specifically to a "Red, White and Blue ABA Ball" and to the production of an "ABA Basketball". It should be noted that the red and the blue of the WBR ball are more vibrant than those used in the official ABA basketball.

Initially, in advertising the introduction of the WBR basketball, AMF referred to its basketball as an "ABA Type Basketball". It is undisputed that many other manufacturers and retail outlets of red, white and blue basketballs have described them in the media as "ABA Style" basketballs and in fact do so to the present time. However, AMF stopped such references some time ago. Indeed, at least once, when the defendants' WBR basketball was so referred to by an AMF customer, the defendant no-

---

2. There is also some indication that some of the league teams sold these balls to their fans.

3. This Court, in setting the date for the hearing of this motion, directed the parties to ask the Board of Trademark Appeals of the United States Patent Office to expedite the hearings and resolution of these objections. This Court specifically sought the expertise of that Board on the questions involved in this case. It was reported to the Court that the Board declined to do so since it would "take a year" before a determination could be made by that Board.

tified the retailer that it did not produce an "official" ABA basketball. Such references at the retail level were stopped thereafter.

Recognizing a trend toward multicolored sports goods, AMF has started production of other types of multicolored balls, e. g., green, gold and white basketballs. These other multicolored basketballs are displayed with the red, white and blue basketball, both in the defendants' catalogues and in retail dealer displays.

## THE PLAINTIFF'S CONTENTIONS

The plaintiff claims that the red, white and blue panels and the arrangement thereof on its official game ball constitute a valid trademark. A copy of the exhibit showing this coloration, which was attached to the plaintiff's application for a trademark filed with the United States Patent Office, is set forth in footnote.[4] This trademark is claimed both on the grounds of a valid statutory trademark and also on the basis of a common law trademark.

The plaintiff further contends that even if at the outset the coloration of its official basketball was not such as to be a trademark, it has achieved that status by a "secondary meaning" or the subsequent association by the public of the coloration of the ball with the league. Cf. Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967).

The ABA charges, first, that the defendants infringed on its claimed trademark by selling basketballs of a coloration similar to that of the claimed trademark; second, that they have engaged in unfair competition by selling such basketballs of inferior quality; and last,

that they diluted the plaintiff's trademark by the display in retail outlets and media advertising of the red, white and blue basketballs with other multicolored basketballs.

Of course, the plaintiff asserts a claim of irreparable harm and all the other elements required for a preliminary injunction.

## THE DEFENDANTS' CONTENTIONS

The defendants contend that the plaintiff's claimed trademark is invalid. In addition, the defendants' claim that there was a prior use; that the pattern of red, white and blue cannot be a trademark; that such a pattern is functional and merely ornamental and decorative; that no secondary meaning has been established; that the plaintiff could not be recognized by the public as a trade source; that, if plaintiff had a right to a trademark, it was destroyed by plaintiff's actions; and that defendants were entitled to refer to their basketballs as "ABA type".

## THE COURT'S CONCLUSIONS [5]

The basic issue of this controversy is whether the claimed trademark of the ABA is valid. I find that it does not meet the minimum standards for a valid trademark under the relevant statute or at common law.

Congress has defined a trademark as:

" . . . any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those of others." Trade-Mark Act of 1946, § 45, 60 Stat. 443, 15 U.S.C. § 1127.[6]

Although this section does not require that a trademark be actually distinctive,

---

4. See Exhibit appended.

5. This section should be considered as only part of the Court's Findings of Fact and Conclusions of Law as required by F.R. Civ.P. Rule 52(a). This opinion should be viewed as a whole, with the Findings of Fact set forth in the earlier parts of this opinion to be "Findings of Fact" as required by the Rule.

6. The statute also defines "service mark" as "a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." Lanham Act, § 45, 60 Stat. 443, 15 U.S.C. § 1127. As used elsewhere in the Statute and as used in this opinion, the word "trademark" includes the words "service mark".

as opposed to being "used by a manufacturer . . . to . . . distinguish" his goods, Section 2 of the Act governing registration of trademarks does include such a requirement. Trade-Mark Act of 1946, § 2, 60 Stat. 428, 15 U.S.C. § 1052; Application of McIlhenny Company, 278 F.2d 953, 47 C.C.P.A. 985 (1960). Thus, in order for plaintiff's claimed trademark to be entitled to statutory protection, it must, in fact, be distinctive.

Cutting through the claims and contentions of the parties, it is this Court's finding that the mere coloration of the various panels of the ordinary basketball is not sufficiently distinctive to be the subject of a statutory trademark. The basketball used by the plaintiff is of the same configuration as an ordinary basketball except that the colors of the particular panels are different. I find that the colors are merely a decoration or embellishment. Norwich Pharmacal Company v. Sterling Drug, Inc., 271 F.2d 569 (2d Cir. 1959); Campbell Soup Co. v. Armour & Co., 175 F.2d 795 (3d Cir. 1949).

The use of colors on sports equipment started some time ago. An early example was the adornment of white tennis socks with a red, white and blue band. This was held *not* to be a protected design under either the law of trademark or otherwise. *Cf.* In re David Crystal, Inc., 296 F.2d 771, 49 C.C.P.A. 775 (1961).

The controlling law as to the use of colors as a trademark is found in the opinion of Judge Duffy in Life Savers Corporation v. The Curtiss Candy Company, 182 F.2d 4 (7th Cir. 1950). In that case, the plaintiff had sued to stop the defendant from using a multicolored package to denote its fruit flavored drops, which package closely resembled in coloration a package used by plaintiff to sell its fruit flavored candies. Each of the packages contained a logo of the manufacturers.

Indeed, the Court held:

"The dominant feature of plaintiff's trademark is the words, 'Life Savers', appearing three times in bold white letters extending practically the length of its label. It would indeed seem unlikely for any purchaser buying a package of 'Life Savers' to avoid knowledge of the origin of the package of Life Savers. The same is likewise true as to any of defendant's packages of hard candy." 182 F.2d, at pp. 7–8.

Thus, where colors are used in combination with a logo, it is the logo, not the colors, which serves to identify the source of the goods.

On all of the basketballs produced at the hearing herein, there was a logo of the manufacturer of the basketball alone save for those which were authorized by the ABA (or the National Basketball Association) which also contained the logo of the professional league. These logos were the truly distinctive features of the various basketballs, not the colors of the panels.

While conceding that color used merely as decoration may not be the subject of a valid trademark, plaintiff claims that its coloration of the basketball forms a distinctive design. Distinctive designs, whether colored or not, may be protected as trademarks. In re Swift & Co., 223 F.2d 950, 42 C.C.P.A. 1048 (1955); The Barbasol Co. v. Jacobs, 160 F.2d 336 (7th Cir. 1947). Far from adopting a distinctive design, however, plaintiff has merely added coloring to the panels of a standard basketball. This change in coloration of the tan panels of previous basketballs was merely decorative or ornamental. Ex parte Hall, 73 U.S.P.Q. 8 (F.T.C.1947); Radio Corp. of America v. Decca Records, Inc., 51 F.Supp. 493 (S.D.N.Y.1943). Therefore, I cannot find that the dyeing of the standard panels in red, white and blue constituted a valid trademark at its

inception. In re Burgess Battery Co., 112 F.2d 820, 27 C.C.P.A. 1297 (1940).

We come then to the question of "secondary meaning", which is an entirely different problem for this Court to resolve. A design which lacks sufficient distinction to qualify as a valid trademark may nonetheless become a good mark if it acquires "secondary meaning". Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938).

Our appellate courts have defined "secondary meaning" as requiring a finding "that the design is a mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source." Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694 (2d Cir. 1961); see also Hygienic Specialities Co. v. H. G. Salzman, Inc., 302 F.2d 614, 620 (2d Cir. 1962).

Basically, "secondary meaning" within the trademark laws is equivalent to an association between the "trademark" and the supposed source of the goods such that an ordinary man would immediately associate the goods with their source. Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967).

Here the basic question is whether the red, white and blue basketball is so identified with the plaintiff that an ordinary man would find that any red, white and blue basketball was the symbol or trademark of the ABA and that the ABA was its source.

To support its claim of trademark due to this secondary meaning, the plaintiff requested the Roper organization to conduct a pilot survey of the market for multicolored basketballs. At the hearing, the results of this survey were received in evidence over the objection of the defendants. This pilot survey, although admittedly incomplete, showed that at best, only 61 per cent of the persons surveyed associated the red, white and blue basketball with the ABA. When considered with the control group which showed a 18 per cent "guess" factor, it would appear that approximately 42 per cent of the people interviewed knowingly associated the ABA with the red, white and blue basketball. This survey was further deficient in that: it was set up so that no logo showed on the red, white and blue basketball; it was limited to a universe of males between the ages of 12 and 23; and it was limited to those who had played basketball within the last year. No attempt was made to contact those who would actually purchase basketballs. For this reason alone, I find the "universe" to be too narrow to allow the survey to be given any substantial weight. Sears, Roebuck and Co. v. Allstate Driving School, Inc., 301 F.Supp. 4 (E.D.N.Y.1969); General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (W.D.Mich.1964).

More difficult on the question of secondary meaning is the use by the defendants of the terms "ABA ball" or "ABA type" basketball in the intercompany memorandum and in the advertising of some of its retailers. This is particularly disturbing since the defendants' ball bears the word "Official". To the trade the designation "official" means of an official weight and size.[7] Since it is known to the trade what the word means, I believe that no unfair competition with the plaintiff occurred. Furthermore, at the time that AMF used these terms in its interoffice memoranda and its advertising, there were a large number of others manufacturing red, white and blue basketballs, each labelled with the logo of the manufacturer. There could be no confusion as to the source of the basketballs. I find that the use of the terms was merely a shorthand way of saying "similar to"

7. I am sending this opinion to the Federal Trade Commission. It appears to me that some might be misled by the simple designation "official". It would appear to me that such a designation, to be completely accurate, should be more fully spelled out to reflect that it refers to "Official Size and Weight".

the red, white and blue basketballs used by the ABA.

Indeed, to have a valid trademark flowing from a secondary meaning, the ordinary man would have to identify the mark with the "source" of the goods. Vandenburg, Trademark Law and Procedure, Second Ed.1968, at p. 3. It has been said of the law of trademarks that:

"Its fundamental purpose is to prevent a person from passing off his goods as the goods of another. The critical question is whether customers are, or may be, misled." Jean Patou v. Jacqueline Cochran, Inc., 201 F. Supp. 861, 863 (S.D.N.Y.1962), aff'd 312 F.2d 125 (2d Cir. 1963).

At no time did the ABA hold itself out to be the source of red, white and blue basketballs. Nor did the plaintiff check the quality of the products of its "licensees" so as to properly control the "source" of the product over which it claims an exclusive trademark.

The ABA produced at the trial Daniel Reilly, who is president of the ABA Merchandising Division. This division was organized in 1972. Prior to this time there is no evidence that quality was mentioned by the plaintiff. Since the organization of the division, Mr. Reilly testified that he had checked on the coloration of the balls and bounced them a few times. It is clear that prior to this time, particularly at the league's outset, inferior basketballs supplied by Wilson Sporting Goods Company were given or sold to the public. This is far from "quality control" over the trademarked goods.

Accordingly, I find that the affixation of red, white and blue panels to an ordinary basketball is not sufficient to create a trademark, and that no "secondary meaning" entitled to the protection of a trademark has been established.

For the reasons cited above, this Court grants the motion by plaintiff to consolidate the hearing of the motion for a preliminary injunction with the trial of the case for a permanent injunction pursuant to F.R.Civ.P. Rule 65(a)(2) and adjudges that the plaintiff's demand for a preliminary and permanent injunction must be denied.

Settle order on notice.