**BROOKS SHOE MANUFACTURING COMPANY, INC., a Pennsylvania Corporation, Plaintiff,**

v.

**SUAVE SHOE CORPORATION, a Florida Corporation, Defendant.**

**No. 79–2230–CIV–EPS.**

United States District Court,
S. D. Florida,
Miami Division.

Nov. 9, 1981.

Richard M. Leslie, Miami, Fla., Alan H. Bernstein, Philadelphia, Pa., for plaintiff.

Dexter W. Lehtinen, Allan M. Lowe, Miami, Fla., for defendant.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

THIS CAUSE came before the Court on a nonjury trial. In accordance with Federal Rule of Civil Procedure 52(a), the following shall constitute Findings of Fact and Conclusions of Law.

Plaintiff, Brooks Shoe Manufacturing Company, Inc., is a Pennsylvania corporation that has no principal place of business in the State of Florida. Defendant, Suave Shoe Company, is a Florida corporation with its principal place of business in Miami, Florida. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as well as jurisdiction pursuant to 28 U.S.C. § 1338 and 15 U.S.C. § 1121.

Count I of the complaint in the case *sub judice* asserts a cause of action for common law unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff's claim is based on their assertion that the "V" design that appears on the sides of Brooks shoes constitutes a common law trademark.[1] It is Plaintiff's belief that

---

1. On December 16, 1976, Plaintiff filed an application for trademark registration in the United States Patent and Trademark Office for the letter "V" positioned upon the representation of a shoe. That application was assigned Serial Number 109,762.

Said application is presently under rejection by the Examiner because the mark, when ap-

the "V" design that appeared on a number of Suave shoes, sold between January and October of 1979, infringed on Brooks' common law trademark and that Brooks is therefore entitled to money damages and injunctive relief.[2]

The use of an unregistered trademark can constitute a violation of 15 U.S.C. § 1125(a) when the alleged trademark used by the Plaintiff is so associated with its goods that the use of the same or similar marks by another company constitutes a representation that the goods come from the same source. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir. 1975). In order to prevail on an unfair competition claim based on an unregistered trademark the Plaintiff must prove:

> (1) that the public recognizes plaintiff's symbol as identifying his goods or services and distinguishes them from those of others, and (2) that defendant's actions cause a likelihood of confusion among the relevant buyer class. Element (1) [can] be shown in either of two ways: (a) that plaintiff's symbol was inherently distinctive or (b) that even if not inherently distinctive, the symbol achieved customer recognition and 'secondary meaning'.

1 J. McCarthy, Trademarks and Unfair Competition § 14:4 at 524 (1973).

It is the view of this Court that there is nothing arbitrary or fanciful about the Brooks' "V" that would make it inherently distinctive. The mark could be characterized as a "V" on its side, an arrow, or a "7".[3] Brooks has not claimed that the "V" is distinctive when used in conjunction with the words "BROOKS", which appears on the heel of their shoes, nor have they argued that the color schemes in which the "V" appears make it distinctive. The only argument that Plaintiff has made with regard to the mark's distinctive qualities is that the tapered upper leg somehow separates the Brooks' "V" from any other "V". The Court feels that this argument lacks merit.

Because Plaintiff's "V" is not inherently distinctive, it must have a "secondary meaning" in order to be protected under the Lanham Act. Moreover, Plaintiff has the burden of proving that their "V" design acquired a secondary meaning prior to the date the Defendant commenced using a similar mark in commerce. 1 J. McCarthy, *supra*, § 7:12 at 172; *Scott Paper Company v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir. 1978).[4] Plaintiff has to

---

plied to the goods of Plaintiff closely resembles the marks of Bata Shoe Company, Inc., of Belcamp, Maryland. The application was also rejected because "the mark was considered to be a merely ornamental design which does not function as a trademark which distinguishes applicant's goods from the goods of another." Defendant's Exhibit 9.

If Plaintiff had obtained a certificate of registration for the "V", it would have constituted *prima facie* evidence of the validity of the registration, the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce in connection with the goods or services in the certificate, subject to any conditions and limitations stated therein. 15 U.S.C. § 1057(b).

**2.** After filling orders for approximately 230,000 pairs of Suave shoes with the "V" design thereon, the Defendant ceased making said shoe after being requested to do so by Brooks. The last order was filled by Suave in October 1979.

Plaintiff's exhibit 50G–2, a Brooks shoe and "V" appears as appendix number 1 to this order and Plaintiff's exhibit 50G–1, a Suave

shoe with the "V" design, appears as appendix number 2.

**3.** Throughout the trial of this cause, counsel for the Defendant referred to their product as the Suave "7" shoe.

**4.** Defendant offered into evidence a number of shoes with "V" shaped designs that were purchased during April and May of 1980. Plaintiff objected to the admission of these shoes on the ground that Defendant could not establish that they were being sold in or about January 1979 and, therefore, they were irrelevant to the issue of the strength of Plaintiff's alleged trademark. At the time of Plaintiff's objection, the Court reserved ruling on this issue.

Having reviewed the cases dealing with the likelihood of confusion, it is the view of the Court that the shoes are relevant to this issue and should be admitted into evidence. Although secondary meaning must be shown to exist at the time Defendant commenced using their allegedly infringing mark in commerce, *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra*, there is no such limitation on proving

prove, therefore, that the "V" had acquired a secondary meaning by January 1979.

■ Secondary meaning can be proved by direct or circumstantial evidence. The variables to be considered in determining whether a mark has acquired secondary meaning include (1) the length of time and manner of its use, (2) the nature and extent of its use and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the mark and a particular source of origin. *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5th Cir. 1974); 3 Callman, Unfair Competition, Trademarks and Monopolies § 77.3 at 349 (3rd ed. 1969).

Plaintiff presented a substantial quantity of circumstantial evidence on the issue of secondary meaning. The evidence shows that Brooks has been selling athletic shoes and related products since 1914. Contrary to what the company's name suggests, Brooks does not manufacture the shoes it sells. Most of Plaintiff's shoes are manufactured by Turner Shoe Manufacturing, a Puerto Rico corporation, under a licensing agreement with Brooks. These shoes are distributed by Brooks and sold primarily in specialty stores, i.e. stores selling a full line of sporting goods and stores specializing in selling athletic shoes. Most of the shoes sold by Brooks are high performance shoes in that they are made of lightweight, durable, high quality materials and they are constructed with features designed to meet the needs of serious athletes.[5]

In 1973, Brooks began selling shoes with a "V" design on the sides and, by 1977, almost every shoe in the Brooks line bore the "V" insignia. Sales of Brooks shoes with the "V" side design extended throughout the United States, including the Southern District of Florida. The sales of such shoes have grown from more than 400,000 pairs in fiscal 1976, to more than 1,500,000 pairs in fiscal 1977 and in fiscal 1978 sales exceeded 2,500,000 pairs of shoes. Brooks claims that this rapid increase in sales can be attributed to their advertising campaign.[6]

Brooks advertising has gone through an evolutionary process. Prior to January 1979, Brooks advertised its running shoes, distinct from its other athletic shoes, with a hard sell approach that featured mechanical and innovative design aspects of the shoes. This type of advertising was almost exclusively confined to magazines directed to a restricted group of readers, such as "Runner's World" and "Running Times". Since January 1979, there has been a shift in Plaintiff's approach in advertising so that it is now doing image advertising whereby the construction of the shoes is not emphasized as much as the name, the stripe and the aesthetic aspects of the shoes.[7] Brooks also engages in promotional activities such as sponsoring races, tennis matches and prize fights and they pay various professional athletes to wear their shoes.

Another source of exposure for Brooks' shoes is their rating from "Runner's World" magazine. In the October 1977 "Runner's World", the Brooks "Vantage", which bears the "V" design, received the highest possible rating and was deemed the number one running shoe in the United States. In the October 1978 issue of "Runner's World", the Brooks "Vantage" and the "Vantage Supreme" received a five star rating, along with the shoes of several other manufactur-

likelihood of confusion. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir. 1980); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir. 1980).

5. *See* Defendant's exhibits 86L, M, N, O and P.

6. *See* Plaintiff's exhibit 53A. There was testimony that running became a popular means of exercising during this period of time and that, to a large extent, Brooks' increased sales could be attributed to this trend.

7. *See* Plaintiff's exhibits 48A, B, C, and D. The "V" design that appears in Plaintiff's ads, as well as on their shoe boxes, stationery and business card, is an elaborate variation of the "V" that appears on their shoes.

These advertising and promotional activities cost Brooks $360,000 in fiscal 1977 and $747,-000 in fiscal 1978. Plaintiff's exhibits 53D, E, 57C, 48A, C, D and Defendant's exhibit 111.

ers, which is the highest rating that could be obtained. In addition to the favorable publicity that "Runner's World" gave to Brooks' products, the "V" was displayed prominently in the article whenever Brooks' shoes were being discussed.[8]

■ Although the sums spent on advertising, its scope, nature and duration are factors that aid the Court in determining whether a mark has achieved a secondary meaning, they are not necessarily conclusive. The critical question in considering the evidence is not the *extent* of the promotional efforts but their *effectiveness* in creating an association between the "V" design and Brooks Shoe. *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970); *Volkswagenwerk v. Rickard, supra*, at 478. In an attempt to measure the effectiveness of their advertising and the degree of recognition of the Brooks' "V", Plaintiff interviewed 212 spectators and participants at organized track meets in the Washington-Baltimore area on February 23, 24 and on March 9 of 1980.[9] 71% of those interviewed properly identified a Brooks shoe with the word "BROOKS" on the heel obscured when the show was shown to them; 33% of those who identified the Brooks shoe attributed their recognition to the "V" design on the side of the shoe.[10]

The statistics on recognition of the Brooks shoe that were obtained from Plaintiff's survey help the Court only to the extent that they can be considered trustworthy and accurate. The Handbook of Recommended Procedures for the Trial of Protracted Cases, issued by the Judicial Conference of the United States in 1960, recommends that the party offering a survey into evidence establish the following: (1) that the proper universe was selected and examined; (2) a representative sample was drawn from that universe; (3) a fair and correct method of questioning

the interviewees was used; (4) the persons conducting the survey were recognized experts; (5) the data gathered was accurately reported; (6) the sample, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (7) the sample and the interviews were conducted independently of the attorneys in the case; (8) the interviewers were adequately trained in the field and had no knowledge of the litigation purposes for which the survey was to be used. 25 F.R.D. 365, 429 (1960). The Fifth Circuit has approved the use of these factors in considering the accuracy of survey evidence offered to show trademark infringement. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).

The survey offered into evidence by the Plaintiff failed to meet virtually every one of the aforementioned factors for the following reasons:

1. The survey was designed and to a degree supervised by Plaintiff's attorney who is not, and does not claim to be, an expert in the field of conducting or designing surveys;

2. A procedure was not utilized to insure that a statistically random group was obtained and census figures confirm that the interviewees were not representative of the racial mixture and educational background of persons living in the Washington-Baltimore area;

3. Question five of the survey suggested that the shoe being shown was a brand name shoe and this introduced an element of bias into the survey;

4. The use of the word "BROOKS" in the survey was also a source of bias and it suggested to interviewers and interviewees that the survey was connected with Brooks Shoes;

---

8. *See* Plaintiff's exhibits 51A and B and Defendant's exhibit 112.

9. There was testimony during the trial that the weather conditions at the running events on February 23 and 24 were so adverse that few nonparticipants were present. Thus, the opinions of those surveyed on these dates, regard-

ing recognition of the Brooks "V", was more representative of participants than of spectators at running events in the Washington-Baltimore area.

10. *See* Plaintiff's exhibits 50A and 58.

5. The interviewers were not given written instructions and the instructions given did not specify how the shoe was to be shown to the respondents in order to insure consistent observation of the mark in question;

6. The data gathered with respect to the likelihood of confusion was inaccurate due to the use of a Brooks shoe instead of a Suave shoe by one of the interviewers; and

7. The interviewers were not required to sign and date the questionnaires for verification purposes contrary to the generally accepted standard for objective procedures. In addition, verification was performed by the survey supervisor and the verification procedure did not allow for calls back to respondents who were not at home.

Unquestionably, the combination of all of the above listed errors raises serious doubts regarding the accuracy and trustworthiness of the results of Plaintiff's survey. The Court is of the opinion, however, that these procedural and methodological errors are not as serious as Plaintiff's failure to select the proper survey universe.

The Fifth Circuit has stated that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe', that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 264; *American Basketball Association v. AMF Voit, Inc.,* 358 F.Supp. 981, 986 (S.D.N.Y.1973), aff'd 487 F.2d 1393 (2d Cir. 1973), *cert.* denied 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974); *Hawley Products Company v. United States Trunk Co.,* 259 F.2d 69, 77 (1st Cir. 1959). Plaintiff's universe, spectators and participants at running events in the Washington-Baltimore area, is far too narrow to give a fair indication of whether the consuming public associates the "V" with Brooks' shoes. It

appears that this universe was selected because Plaintiff's advertisements are directed towards serious runners and because Plaintiff's shoes have been acclaimed in running magazines. The people interviewed were those most likely to recognize the Brooks "V" rather than people whose opinions would fairly represent the opinions of consumers of athletic footwear.

■ Since the survey failed to examine the proper universe, the 71% recognition rate among those interviewed must be discounted. *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 507 (5th Cir. 1980); *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 264. Moreover, even if the universe selected was proper for the purpose of determining secondary meaning, Plaintiff made so many errors in conducting the survey that their own expert said the survey results were not numerically projectable. This means the survey results do not even represent the opinions of spectators and participants at running events in general. Finally, it is the view of the Court assuming *arguendo* the universe selected was proper and the methodology was correct, that the survey results would be of limited value because they did not indicate whether any of the respondents could have identified a Brooks' shoe prior to January 1979 by reference to the "V" design.[11]

The Defendant also introduced a survey on secondary meaning into evidence.[12] This survey was designed by Doctor Robert C. Sorenson, a recognized expert in the field of marketing research. The objective of Defendant's survey called for the completion of one interview with a qualified respondent in at least four hundred households randomly selected in the two metropolitan areas of Baltimore, Maryland and Greensboro, North Carolina. The households from which respondents would come were to be selected from the total universe of households in the two metropolitan areas that

---

11. The respondents were asked "[h]ow long have you known about Brooks running shoes?" The answer to this question, regardless of the length of time, does not help the Court determine whether the respondent could have recognized a Brooks shoe, by observing the "V" design, in or before January of 1979.

12. *See* Defendant's exhibit 84.

included one or more individuals who had purchased one or more pairs of athletic type shoes during the previous twelve months. Probability list sampling techniques were utilized to select households from the most recent telephone directories for the respective metropolitan areas.

The questionnaire used in Defendant's survey was designed by Dr. Sorenson and consisted of two parts. The screening questionnaire established that a household existed at the telephone number contacted and that respondents did or did not exist in the household who qualified for an interview concerning their purchase of athletic type shoes. The main questionnaire contained the questions concerning consumer identification of athletic type shoes. Each interviewer was personally briefed by Dr. Sorenson and then test interviews were given to insure that the procedure for conducting the interview, which was set forth in detail in the questionnaire, was understood and followed.

In order to determine whether the "V" on the side of a shoe was attributed to any particular source of origin, 404 respondents were shown a Brooks shoe completely masked with tape except for the entire design pattern on both sides of the shoe.[13] The respondents were asked "[i]f you have a belief about the company or companies that make this shoe?" Only 2.7% of the respondents indicated that they believed it was a Brooks shoe. These results were verified by an independent organization by making telephone contact with 15% of all respondents. In addition, a certain percentage of each interviewer's work was routinely examined for accuracy by the supervisors. These verification procedures showed the survey results to be accurate.

A review of the procedures and methodology utilized in the Defendant's survey establish that the survey substantially complies with the factors set forth in the Handbook for the Trial of Protracted Cases, *supra*. The Court is of the opinion that the universe selected, households where one or

more individuals had purchased one or more pairs of athletic type shoes within the last twelve months, adequately represents the opinions of the class of buyers relevant to the issue of secondary meaning in the case *sub judice*. The fact that only 2.7% of those people interviewed in Defendant's survey recognized the source of the "V" to be Brooks, indicates to this Court that the public's association between the "V" and Brooks Shoe Manufacturing Company is *de minimus*.

■ Viewing the direct and circumstantial evidence as a whole, it is the view of this Court that the Brooks "V" is not a common law trademark subject to the protection afforded by Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). There is nothing inherently distinctive about the "V" and the efforts made to promote a connection between the "V" and Brooks, prior to January 1979, were not so substantial that an inference of secondary meaning can be drawn therefrom. Moreover, the weight that should be given to the respective survey results, in light of the foregoing analysis, supports the conclusion that the Brooks "V" had not acquired a secondary meaning in January of 1979.

Throughout the trial of this cause, Plaintiff has argued that the Defendant's intentional copying of the "V" creates a presumption of secondary meaning because "[t]here is no logical reason for precise copying save an attempt to realize upon a secondary meaning that is already in existence." *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551 (9th Cir. 1960). The evidence shows that Suave intentionally copied the "V" design and the color schemes used by Brooks and other shoe manufacturers. However, the cases cited by Plaintiff, wherein a presumption of secondary meaning arose, involved situations where there was an unquestionable effort to palm off a forgery of the Plaintiff's product by intentionally copying a distinctive trademark used by the Plaintiff in connection with the sale of their goods.

13. 204 respondents were from the Baltimore area and 200 were from the Greensboro area.

All of the results referred to are net results from the two areas.

Id.; see also Scholl, Inc. v. Eagle Hygenic Rubber Co., 185 U.S.P.Q. 754, 756–57 (S.D. N.Y.1975); E. R. Squibb & Sons, Inc. v. Premo Pharmaceutical Labs, Inc., 195 U.S. P.Q. 545, 547 (S.D.N.Y.1977); Polo Fashions, Inc. v. Extra Special Productions, Inc., 451 F.Supp. 555, 563 (S.D.N.Y.1978). Defendant's conduct in these cases was such that they should not be heard to complain if the Plaintiff did not go through all of the tedious requirements of proving secondary meaning.

In the case at bar, if the word "BROOKS" had appeared on the heel of the shoe, or a name confusingly similar to that of the Plaintiff's, such as "BROKS", and the "V" shaped design was used as well, it is the view of the Court that Plaintiff's failure to prove secondary meaning might not have precluded them from obtaining the relief they seek.[14] Proof that the buying public associates the "V" with Brooks shoes, however, is the sine qua non of Plaintiff's claim and the nature of Defendant's copying in this case does not relieve Plaintiff of their burden to prove secondary meaning.

Assuming that Plaintiff could establish that the "V" has acquired a secondary meaning by January 1979, they have not proved by a preponderance of the evidence that Defendant's use of a similar mark is likely to cause confusion. "In determining whether there is a likelihood of confusion, the finder of fact evaluates a variety of factors: the type of trademark, the similarity of design, the similarity of the product, the similarity of the advertising media used, the defendant's intent and actual confusion." Exxon Corp. v. Texas Motor Exchange, supra at 504; Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 45 (5th Cir. 1975).

■ The first factor to be considered is whether the "V" is a strong or weak trademark. "Pursuant to the 'strong-weak' distinction, simple geometric shapes, even if given protection, are accorded a narrow scope of trademark or unfair competition protection, both as to the scope of the product and variation in design. Thus, said marks are said to be 'weak'." 1 J. McCarthy, supra § 7:13 at 173. Based on the fact that there is nothing inherently distinctive about the Brooks "V", the Court feels that it is a weak mark just like any other simple geometric shape.

"The similarity of design test has been described as nothing more than a subjective eyeball test. The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual feature of the marks." Exxon Corp. v. Texas Motor Exchange, supra, at 505 (citations omitted). An examination of Suave's shoes shows that their "V" is used in a manner quite similar to Plaintiff's use of the "V" and Suave manufactures its shoes in the same color schemes as Brooks does. Visually, the only distinction that can be made between the respective marks is that the upper leg of the Brooks "V" is tapered whereas the upper leg of the Suave "V" is not and the Suave shoe does not have the word "BROOKS" imprinted on the heel.

The third factor to be considered is the similarity of the products involved. The evidence clearly shows that the products involved are identical in nature, i.e. athletic type footwear. However, the quality and

---

14. Although there is a line of cases in the Second Circuit that allow proof of copying to be substituted for proof of secondary meaning, that is not the law in the Fifth Circuit. In Exxon Corp. v. Texas Motor Exchange, supra, the Fifth Circuit held that "[a] defendant's intent to deceive buyers is merely a factor to be considered in determining whether there is a likelihood of confusion." Id. at 506.

By contending that secondary meaning should be implied when intent to copy is proven, Plaintiff is asking this Court to find a violation of section 43(a) solely on the basis of Defendant's intent without requiring proof of secondary meaning or likelihood of confusion. This approach could result in the imposition of liability based on the Defendant's subjective intent instead of on an objective determination that there is a likelihood that the public would be confused. The Court feels that such an approach would be improper because section 43(a) was designed to protect the public from deceptive trade practices, not to punish persons who copy a mark or a name, and the requirement of proving secondary meaning insures that liability will only be imposed when the trade practice at issue is truly deceiving.

use of the parties' respective products forms some basis for distinguishing between the two. Brooks shoes are made of lightweight, durable, high quality materials and they are constructed with features designed to meet the needs of serious athletes. Because of the high quality materials used, and the cost of producing specialty footwear, the majority of Brooks shoes were selling at retail prices in excess of $25.00 per pair in 1978. The evidence shows that Brooks shoes are purchased by serious athletes to be used as a running shoe and that use of the shoes for leisure wear, although extensive, is not the primary reason for purchasing a Brooks shoe. People who are purchasing shoes primarily for leisure wear are much more likely to buy the low priced Suave shoe. Suave shoes are constructed with inexpensive materials and are not constructed with features that would make them suitable for serious runners.[15] The Suave shoe is designed and purchased primarily as a cheap leisure shoe.

Identity of retail outlets and purchasers is the fourth factor to be considered when determining the likelihood of confusion. "Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendant's products lessen the possibility of confusion, mistake or deception." *Amstar Corp. v. Domino's Pizza, Inc., supra,* at 262. As stated above, the consumers of the respective shoes differ in that purchasers of Brooks shoes are serious athletes looking for a shoe that will last and protect them from injury, whereas purchasers of Suave shoes are consumers looking for an inexpensive leisure shoe. The evidence also shows that the retail outlets where Brooks and Suave shoes are sold differ significantly. Suave sells virtually all of its shoes, on a purchase order basis, to mass merchants, generally of a discount type such as K-Mart or Kresge. The shoes are rarely sold in boxes and are usually displayed by piling them together on a table or shelf. By comparison, Brooks shoes are sold at stores specializing in sporting goods or athletic shoes. Brooks' outlets generally display each type of shoe they sell individually and the salesmen give close personal attention to the needs of the customer with regard to the features and fit of the shoes.

The fifth factor to be considered is the similarities in the parties' advertising. There are no similarities in this category because Suave does not advertise their shoes. Although a Suave shoe occasionally appears in one of their retailer's advertisements, said advertisements are usually placed in local newspapers not running magazines with national distribution.

An additional factor to be considered in determining the likelihood of confusion is the Defendant's intent to deceive buyers. The Fifth Circuit has stated that "[i]f . . . a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity'." *Exxon Corp. v. Texas Motor Exchange, supra* at 506; Restatement of Torts § 829 Comment f (1938); *Amstar Corp. v. Domino's Pizza, Inc., supra.* In the case at bar, the evidence on Defendant's intent is mixed. Although Plaintiff has proved that the Defendant intentionally copied their "V" design, and used it in the same color schemes used by Brooks, the evidence also shows that the "V" design and color schemes were fashionable and that they did not constitute a representation as to the origin of the shoes that bore them. Thus, there is evidence of an intent to copy a fashion, but there is no proof that the Defendant intended to derive benefit from the *reputation* of the Plaintiff.

The above-mentioned factors may be used to circumstantially prove a likelihood of confusion, but "[t]he best evidence of likelihood of confusion is provided by evidence of actual confusion." *Exxon Corp. v. Texas Motor Exchange, supra,* at 505. Rather than rely on circumstantial evi-

---

**15.** During the period between January of 1977 and January 1979, the average Suave shoe sold in a price range from $8.00 to $12.00 at retail. Plaintiff's exhibit 4.

dence, both parties introduced survey evidence on instances of actual confusion.

In order to determine whether a Suave shoe would be mistaken for a Brooks shoe, Plaintiff had 211 persons interviewed at organized running events in the Washington-Baltimore area on March 9, 23 and on April 25, 1980. 39% of the people interviewed thought that the Suave shoe was a Brooks shoe and 48% of these people thought so because of the "V" design on the side of the Suave shoe.

In testing for confusion between the Suave shoe with the "V" design and a Brooks shoe, Defendant used the same respondents questioned on secondary meaning. Those respondents who asserted that they had a belief about who made the masked Brooks shoe were shown five additional shoes. The fourth such shoe was a Suave and only 5.9% of the respondents that saw it thought it was a Brooks shoe.

Unfortunately, Plaintiff made the same methodological and procedural errors in their confusion survey that were made in the secondary meaning survey and, once again, the survey universe was incorrect. The Fifth Circuit has stated, in cases where survey results were introduced to show the likelihood of confusion, that the "appropriate universe should include a fair sampling of those purchasers likely to partake of the alleged infringer's goods or services." *Exxon Corp. v. Texas Motor Exchange, supra* at 507; *Amstar Corp. v. Domino's Pizza, Inc., supra* at 263. The universe selected for Plaintiff's survey, rather than containing a fair sampling of persons likely to purchase Suave shoes, consists of those persons most likely to purchase Brooks shoes and, therefore, the 39% confusion rate deserves little weight. The universe selected by the Defendant, on the other hand, contained a fair sampling of likely purchasers of Suave shoes and the 5.4% rate of confusion is, in this Court's opinion, a much more credible

indicator of actual confusion than the results obtained from Plaintiff's survey.

■ A review of all the evidence introduced on the issue of confusion shows that the products involved are the same and the "V" shape that appears on both of the shoes is similar. However, the "V" is a weak mark, the retail outlets and purchasers of the products differ significantly, the advertising media used are different and, most importantly, the survey evidence indicates that the incidence of actual confusion is very low.

These factors, viewed as a whole, lead this Court to believe that it is unlikely an appreciable number of buyers would be confused by the Suave shoe. Because the Plaintiff has failed to prove both of the requisite elements of liability for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Court finds in favor of the Defendant on Count I. 2J. McCarthy, *supra* § 23:1 at 35.

■ "The gist of unfair competition in Florida is 'palming off'." *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1262 (5th Cir. 1971). Palming off, of course, is attempting to sell one's products as that of another. In light of this Court's conclusion that Suave did not attempt to palm off its shoes as Brooks shoes, Plaintiff has failed to prove their cause of action under Section 501.204, Florida Statutes. In addition, the Court's finding that it is not likely the Suave shoe would be confused with a Brooks shoe means the Plaintiff has failed to prove a violation of Florida's dilution statute, Fla.Stat. § 495.151. *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445 (5th Cir. 1973). Accordingly, the Court finds in favor of the Defendant on Counts II and III of the complaint.[16]

Within ten (10) days from the date of this Order, Defendant shall submit an itemized list of costs and a proposed Final Judgment. Plaintiff shall have five (5) days from receipt of same in which to file objections.

---

**16.** The Court bifurcated the trial in this cause with respect to the liability and damage issues. In light of the finding that Plaintiff has failed to establish liability, there is no need to hear evidence on the issue of damages and an appropriate final judgment will be entered in this cause.