**STERLING PRODUCTS CO., Inc.,**
**Plaintiff,**

v.

**The CREST MANUFACTURING CO., and**
**Daniel C. Larkin, Defendants.**

**Civ. A. No. 26982.**

United States District Court,
E. D. Michigan, S. D.

June 18, 1970.

Joseph R. Papp, Harness, Dickey & Pierce, Detroit, Mich., Marvin Jacobson, Stryker & Jacobson, St. Paul, Minn., for plaintiff.

B. Lynn Enderby, Burton & Parker, Detroit, Mich., Jerome F. Fallon, Dawson, Tilton, Fallon, Lungmus & Alexander, Chicago, Ill., for defendants.

## OPINION

FREEMAN, Chief Judge.

This is a declaratory judgment action brought by Sterling Products Company, Inc., a Minnesota corporation, seeking a determination that patent No. 3,109,537, issued to defendant Daniel C. Larkin, for a removable trash receptacle to be used in an automobile, is invalid because the claimed invention was 1) obvious to one reasonably skilled in the art (35 U.S.C. § 103) and 2) on sale, in public use, or described in a printed publication in the United States more than one year prior to the date of filing the patent application (35 U.S.C. § 102).

Defendant Larkin, the patentee, and Crest Manufacturing Company, the exclusive licensee under said patent, deny the patent's invalidity and assert two counterclaims: 1) that plaintiff is infringing patent No. 3,109,537 and 2) that certain marks of plaintiff constitute false designations of origin (15 U.S.C. § 1125(a)).

On December 23, 1965, this court issued a preliminary injunction forbidding Sterling from using the designation "Litter Bin," the slogan, "Every Car Can Use Two," or a mottled band or a silver, gold, or white band encircling the container.

The first two sections of this Opinion will discuss the patent claims of plaintiff, the third section will deal with the question of infringement, and the fourth section will consider the alleged false designation of origin.

I

*Obviousness (35 U.S.C. § 103)*

The first issue presented is whether defendants' invention was or was not obvious to one reasonably skilled in the art. The test of patentability under Section 103, relating to obviousness, lends itself to several basic factual inquiries.

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

The Supreme Court further stated that considerations such as commercial success, long felt but unresolved needs, and failure of others are "secondary". *Id.* See also Proler Steel Corp. v. Luria Bros. & Co., Inc., 417 F.2d 272 (9th Cir. 1969).

The first factual inquiry thus presented is the scope of the prior art. Defendants would restrict the prior art to "trash receptacles which were designed for use in a moving vehicle." The court agrees with plaintiff, however, that the relevant prior art should not be so narrowly defined. Essentially, the problem presented to an inventor was how to mount a removable receptacle on a rounded surface. The examiner for the patent office utilized the prior art including that relating to mounting ash trays on chair arms in evaluating defendants' invention. It is now too late for defendants to assert that most of the patents relied upon by the patent examiner were really not a part of the relevant prior art.[1]

The plaintiff argues further that defendants' Exhibit-3, hereinafter referred to as the Buick container, constitutes the best prior art. This container was sold to the Buick Division of General Motors Corporation in 1959 and was superseded by the patented container.

Defendants contend that the Buick container was really an infringement of

[1] The following patents were considered to constitute part of the relevant prior art, as does the court:

| | | |
|---|---|---|
| Beiling | 1,738,557 | December 10, 1929 |
| Hartley | 2,916,184 | December 8, 1959 |
| Olson | 2,988,206 | June 13, 1961 |
| Bellow | 2,219,974 | October 29, 1940 |
| Bellow (British) | 240,359 | October 1, 1925 |
| Bellow (British) | 360,186 | November 5, 1931 |
| Willoughby (British) | 571,939 | September 14, 1945 |

The court also considers the following patent to constitute part of the relevant prior art, although it was not considered by the patent examiner:

| | | |
|---|---|---|
| Finney | 2,660,347 | February 10, 1950 |

Hartley's patent, No. 2,916,184 [plaintiff's Exhibit-L2]. More specifically, defendants claim that the base, by which the receptacle is stabilized, does not have "flaps" as required by defendant Larkin's patent nor anything that would suggest flaps to one reasonably skilled in the art.

The court has considered the testimony of Dr. Youngdahl, a professor of engineering called as an expert witness by defendants, and that of plaintiff's expert witness, Mr. Fisher. Both witnesses testified that the claims of the patent in suit read directly on the Buick container with one exception—the Buick container was not provided with an underfacing of foam rubber.

The court has also examined the Buick container [defendants' Exhibit-3], has compared it with the patented container [defendants' Exhibit-2], and concludes that the Buick container is not merely the embodiment of Hartley's container, with a so-called pillow base, but that the end extensions of defendants' Exhibit-3 are "flaps" and that they are used for the same purpose as those in the patent. Consequently, the Buick container must be considered to be part of the relevant prior art. It may be noted that the patent examiner was not made aware of the Buick container at any time in the proceedings before him; consequently, no presumption of validity [2] of Larkin's patent is applicable to this undisclosed portion of the prior art. Eisele v. St. Amour, 6th Cir., 423 F.2d 135, March 25, 1970.

Taking the relevant prior art as a whole, including the Buick container, this court finds and concludes that the changes necessary to produce the patented trash receptacle would be obvious to one skilled in the art. The patent claim specified four elements, the combination of which is relied upon to distinguish the prior art.

"These elements include (1) the securement at two specified points; (2)

the weighted granular material at the strap ends; (3) the wider strap ends; and (4) the sponge rubber underfacing." Defendant Crest's First Post-Trial Brief at pp. 29–30.

It is clear from the file wrapper [plaintiff's Exhibit-L] that each element relied upon to distinguish the prior art is itself old. On this point, the court agrees with the patent examiner.

The British patent to Bellow (360,-186) shows a connecting strap of complementary opposed flexible box-supporting flaps secured to the bottom wall of the box to be old. To secure this strap at two points on opposite sides of the bottom wall, after the teaching of the patents to Hartley, et al., the British patent to Bellow (240,359) and defendants' own Buick container [defendants' Exhibit-3], would be obvious to one skilled in the art.

Several patents show that the idea of placing a weighted material in the ends of the flaps is old. See Bellow, British patent No. 240,359 (1925); Bellow, British patent No. 360,186 (1931); Beiling, United States patent No. 1,738,-557 (1929); Finney, United States patent No. 2,660,347 (1953); and defendants' Buick container.

The use of end flaps which are wider than the container is shown in Beiling's patent (No. 1,738,557) and defendants' Buick container.

The use of sponge rubber underfacing would be obvious to any layman and use of a frictional coating is shown frequently in the prior art.

Thus, if this patent is to be sustained, it must meet the stringent requirements imposed upon combination patents. In this regard, the Supreme Court has stated:

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58

---

2. "A patent shall be presumed valid. The burden of establishing invalidity of a pat-

ent shall rest on a party asserting it." 35 U.S.C. § 282.

S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.

* * * * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151–153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

Also compare United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), where a combination patent was upheld where the combination led to wholly unexpected results.

■ In the instant patent, defendants have aggregated four elements, all known to the prior art, which, together, perform no new function than that heretofore performed by them. Such an assembly, although clever, is not patentable, since it adds nothing to the sum of useful knowledge.

## II

### "On Sale" (35 U.S.C. § 102)

Plaintiff also argues that defendants' invention was "on sale in this country, more than one year prior to the date of the application for patent in the United States," contrary to 35 U.S.C. § 102(d). As to this issue, plaintiff has the burden of proof. The critical date here is July 19, 1960, the patent application having been filed July 19, 1961.

■ Defendants argue that their negotiations and relationship with Cadillac prior to and for some time after the critical date were for the purpose of reducing Larkin's invention to practical use, thus falling within a well-recognized exception to the requirements of Section 102. Defendants have the burden of proving that their activities prior to July 19, 1960, if proven, were substantially part of an experimental program. Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc., 409 F.2d 99, 100 (6th Cir. 1969).

■ This one-year statutory bar has been described as being intended to prevent an inventor from obtaining profits from his invention for a number of years and later obtaining a patent and the monopoly associated with it. He is not permitted, in this manner, to extend the period of the monopoly granted to him by law. There is an exception to this rule, however, where the prohibited activities are "substantially for purposes of experiment." The type of experiment envisaged is that necessary for the purpose of perfecting an incomplete invention or determining whether an invention is functional. Ajem Laboratories, Inc. v. C. M. Ladd Co., Inc., 6th Cir., 424 F.2d 1124, April 29, 1970. W–R Company v. Sova, 106 F.2d 478 (6th Cir. 1939); Minnesota Mining and Manufacturing Co. v. Kent Industries, Inc., 409 F.2d 99 (6th Cir. 1969); Tool Research and Engineering Corp. v. Honcor Corp., 240 F.Supp. 296 (S.D.Cal.1964).

The evidence in this record establishes that the Cadillac Motor Car Division of General Motors Corporation was considering adding some form of litter container to its line of accessories in early 1960. In furtherance of this objective, Cadillac requested samples of litter containers made by several companies in-

cluding the defendant Crest. Responding to this request, Crest submitted its Buick-style container in January 1960. After examining, and presumably testing, the containers received, Cadillac decided to purchase about 3,000 of Crest's Buick-style containers. See Defendants' Exhibit-6; Plaintiff's Exhibit-VV and WW; and R-24.

Defendants were apparently dissatisfied with the performance of the Buick-style container, and Mr. Larkin, Sr., developed a new base portion or saddle strap. Essentially, this constituted a strap with longer flaps, the underside of which is foam rubber. The strap is in turn attached to the plastic box or container. The new device, created by Larkin in early 1960, differed from the patented device only in that it had a base plate which the patented container does not have.

Two hand-made samples of the new litter container, with a base plate, were submitted to Cadillac on April 27, 1960. Cadillac made a detailed drawing of this container dated April 29, 1960. Plaintiff's Exhibit-K. On the same day, a pro forma order was placed by Cadillac for the two containers which had already been delivered. Defendants' Exhibit-7. While there is testimony that the drawing was not available to persons outside the Cadillac organization, it appears to the court that this restriction was made by Cadillac as a normal procedure and for its own purposes.

On June 7, 1960, Cadillac ordered 3,004 of the new-style litter containers. Four of these containers were for the use of Cadillac Engineering Department, apparently for the purpose of testing production samples for quality control. Record, p. 288; Defendants' First Post-Trial Brief, p. 8. Cadillac accepted the type and form of litter container when the Engineering Department approved it for purchase on May 19, 1960. Plaintiff's Exhibit-ZZ. It appears to this court that a need for subsequent evaluation of production samples resulted from the fact that Crest was a new supplier

of a new product, and Cadillac wished to assure itself of a proper quality of product, rather than to enter into an experimental program with Crest to "perfect" Crest's litter basket.

Crest has produced no evidence of difficulties with the new-style saddle base after it was attached to a litter container and submitted to Cadillac on April 27, 1960, nor has it shown what kind of testing procedures it used or the results thereof.

While defendants did delete the base plate in February 1961, (see defendants' Exhibit-9 and plaintiff's Exhibit-iii), the court cannot conclude on this record that such change resulted from an experimental program by Crest. The mere fact that a change or refinement of the product was made will not support an inference that such an experimental program existed. Defendants have not met their burden of proving that their activities with Cadillac prior to July 19, 1960, were solely or even substantially part of an experimental program.

For these reasons, the court concludes that the patented device was "on sale in this country, more than one year prior to the date of" filing the patent application.

### III

#### *Infringement*

Defendants' patent covers a *combination* of four elements: 1) a weighted granular material in the strap ends; 2) a sponge rubber underfacing; 3) securement at two specified points; and 4) the strap ends are wider than the box. Only by combining these four elements was Mr. Larkin able to persuade the patent office to issue this patent. (See plaintiff's Exhibit-L.)

The accused device is quite similar to defendants' product in appearance, consisting of a plastic box to which is attached a flexible strap having a sponge rubber underfacing, designed to drape over the tunnel hump of a car. Like

defendants' device, there is also a granular, weighted material in the ends of the strap. However, unlike defendants' device, the ends of the strap are not wider than the bottom of the box, and a stiffener has been inserted in the strap in the area directly under the box.

Crest alleges that the Sterling container infringes its patent No. 3,109,537 in that the narrow flaps and stiffener of plaintiff's device are the equivalent of defendants' wide end flaps secured at two points inwardly from the edge of the box and outwardly from the median line, as claimed in its patent. It should be noted that defendants concede that if plaintiff produced a product identical to defendants' except that the end flaps were not wider than the box bottom, such product would not infringe defendants' patent.

"What Sterling did in its attempt to avoid infringement, essentially, was to narrow the flap ends and change the screw locations. It is admitted that by doing this—and nothing more, Sterling would have avoided infringement." Defendants' First Post-Trial Brief, at p. 40.

Infringement, as it relates to the doctrine of equivalents, has been discussed by the Court of Appeals for this circuit in the following terms:

"In order to infringe a patent, a device or machine must not only perform the same, or substantially the same, function or accomplish the same result as the patented invention, but it must also perform the function or accomplish the result by identical, or substantially identical, or equivalent means. Conversely, a machine or device which performs the same function or accomplishes the same result by substantially different means, or by a substantially different principle or mode of operation, or in a substantially different way, does not infringe the patented invention." Nickerson v. Bearfoot Sole Company, 311 F.2d 858, 879 (6th Cir. 1962).

Apparently, the wide end flaps were made necessary because the flexible saddle base strap was attached to the box bottom at only two points. Thus, the restraining force of the strap had to be transmitted to the box at these two points as explained by Professor Youngdahl. (See Tr. pp. 141–212 and defendants' Exhibits-34, 35, and 36).

On the other hand, it appears to the court that plaintiff's use of the stiffener is the equivalent of attaching the strap to the box at four points, roughly, in each corner of the stiffener. (Cf. Tr. pp. 147 and 151). It will also be noticed, as pointed out by Professor Youngdahl and illustrated by him on defendants' Exhibit-36, that the point from which the restraining forces of the strap originate and where these forces act in the two devices upon the box are different. In plaintiff's device, the force originates in the center of the flap and is directed outward to the edge of the stiffener. In defendants' patented device, the force originates in the edge of the strap and is directed inward to the relevant point of securement. (See defendants' Exhibit-36).

While the accused device does perform the same function and obtains the same result as the patented device, the court finds that it does not operate in the same manner, or utilize the same principle, as the patent claim. Plaintiff's device has the equivalent of four points of securement instead of the two claimed in defendants' patent, and the restraining force of the plaintiff's strap originates at a different point and operates at a different point than in defendants' strap. For these reasons, the court concludes that plaintiff's device is not the equivalent of defendants' device and therefore does not infringe patent No. 3,109,537.

## IV

### False Designation of Origin

In a counterclaim, Crest alleged that Sterling was falsely designating the

origin of its competing and identical trash receptacle. Specifically, defend- ants and plaintiff used the following designations:

|      *Crest*      |      *Sterling*      |
| --- | --- |
| Litter Basket | Litter Bin |
| Every Car Needs Two | Every Car Can Use Two |
| A mottled band around the top of the receptacle | A mottled band around the top of the receptacle |

———◆———

Crest alleges that its designations listed above had become associated in the purchasing public's mind with Crest products and that Sterling's designations infringed them.

Sterling denies both that these designations have become so associated with the Crest Manufacturing Company and that it has infringed Crest's designations.

Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), hereinafter referred to as Section 43(a), provides in relevant part as follows:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, * * * shall be liable to a civil action * * * by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

It is also pertinent to note that Congress stated the purpose of the Lanham Act in the following terms:

"The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against un- fair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." 15 U.S.C.A. § 1127.

It is established that Congress did not undertake to regulate all business conduct that might be deemed unfair. Section 43(a) provides a right of action only "to persons engaged in interstate commerce, * * * against deceptive and misleading use of common law trade-marks," and the similar misleading use of words, names, symbols, or devices adopted by a merchant to identify his goods. Federal-Mogul-Bower Bearings, Inc., v. Azoff, 313 F.2d 405, 409 (6th Cir. 1963). See also Geisel v. Poynter Products, Inc., 283 F.Supp. 261 (S.D.N.Y.1968), and Samson Crane Co. v. Union National Sales, Inc., 87 F. Supp. 218 (D.Mass.1949). Assuming *arguendo* that Sterling's designations infringed those of Crest, this court concludes that Sterling could not violate Section 43(a) unless Crest's claimed designations had acquired, in the mind of the average purchaser, an association with the Crest Manufacturing Company which indicated to said purchaser that the product bearing these designations on its label, singly or in combination, originated with Crest. It is not required that this purchaser think of Crest's name; only that he associate the product as coming from a single source. It

is unimportant whether this association is termed "secondary meaning" (W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868 (2nd Cir. 1966)) or "a quality similar to secondary meaning" (General Pool Corp. v. Hallmark Pool Corp., 259 F. Supp. 383, 386 (N.D.Ill.1966)). The primary significance of the designation in the mind of the average consumer must not be the product but rather the producer.

Such association need not be shown by direct evidence. Like any other ultimate fact, it can be established by circumstantial evidence, such as extensive advertising, sales, etc. Goodyear Tire & Rubber Co. v. H. Rosenthal Co., 246 F.Supp. 724, 727 (D.Minn.1965), and W. E. Bassett Co. v. Revlon, Inc., *supra.*

It is important to observe at this point that the designation "Litter Basket" is a descriptive term and cannot, therefore, be appropriated for use as a trademark unless secondary meaning is shown, and this showing must be with reference to the ultimate purchaser. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699 (2nd Cir. 1961). Crest's claim that the designation "Litter Basket" is a true or technical trademark cannot be sustained, for such a mark must be coined or fanciful. *Id.*, at p. 700. It is difficult to think of a term that is more descriptive of the product being sold or that is in more common use to describe trash receptacles of like purpose than "litter basket." See, e. g., plaintiff's Exhibit-BBBB.

Also, Crest's argument that the designation had acquired a secondary meaning with reference to automobile trash receptacles because of its use by Crest since 1959 cannot be sustained. The evidence does show that Crest has spent about $250,000 in national advertising between 1959 and 1969. Tr. p. 462. The court finds that most of this advertising was with reference to "Litter Baskets" and that Crest sold about five million trash receptacles in this period bearing the designation "Litter Basket." Tr. pp. 67–68.

The evidence also establishes that some sales of Crest's product were to automobile companies to be sold by them as accessories and that they did not advertise Crest litter baskets. Buick advertised a Buick Litter Basket (Tr., p. 117 and plaintiff's Exhibit-NN, OO, and PP), while Cadillac advertised its litter box (plaintiff's Exhibit-GG). On balance, the evidence will not support a finding that the term "Litter Basket" has become associated in the public's mind with the products of the Crest Manufacturing Company.

In the absence of such secondary meaning, with reference to "Litter Basket," it cannot be said that Sterling's use of its designation "Litter Bin" constitutes a false designation of origin. The conclusion is reinforced by the fact that each company here places its name in a prominent place on "the label of its trash receptacle."

The court also finds that Crest has failed to carry its burden of proving that the other two designations have acquired a secondary meaning. Most of the evidence submitted by Crest, and Sterling for that matter, dealt with the term "litter basket." There is no showing as to how much of Crest's advertising employed the slogan, "Every Car Needs Two" or whether it even mentioned the mottled band around the receptacle. There was no other evidence from which the court can find that these two claimed designations have otherwise acquired a secondary meaning. Bechik Products v. Federal Silk Mills, 135 F. Supp. 570 (D.Md.1955). Indeed, it seems to the court that the mottled band is primarily decorative and serves no function in identifying Crest's product. Application of Swift & Co., 223 F.2d 950, 953, 42 C.C.P.A. 1048 (1955).

Finally, it should be noted that Crest filed its counterclaim under Section 43(a) on October 5, 1965. Sterling's argument that Crest must establish its right to exclusive use of the claimed des-

ignations under Section 43(a) as of the date of the counterclaim seems to this court to be well taken.

Sterling began to use its challenged designations on its trash receptacle in late 1964. The use of these designations by Sterling was prohibited by a preliminary injunction issued by this court on December 23, 1965. Thus, unless Crest were required to prove its right to exclusive use to its claimed designations as of October 1965, it would be in the position of being able to enjoin its competitor from using similar designations and then establish a secondary meaning for its own. From this perspective it should be noted that much of the evidence considered above as to the issue of secondary meaning relates to the period after October 1965.

## V

### *Conclusion*

The court concludes that patent No. 3,109,537 is invalid because the invention was 1) obvious to one reasonably skilled in the art and 2) on sale more than one year prior to the date of the application for the patent. Defendants failed to establish by a preponderance of the evidence that their activities in offering the receptacle for sale prior to July 19, 1960, the so-called critical date, were substantially for the purpose of perfecting the invention or experimentation.

The court finds that the accused device does not infringe the Larkin patent.

The court also concludes that defendants have not met their burden of proving that Sterling was guilty of falsely designating the origin of its auto trash receptacle.

The court has reached its rulings in this case with great reluctance in view of the reprehensible conduct of plaintiff in substantially copying defendants' patented device, even though within permissible limits of applicable law. Condemnation of such conduct was well expressed by the Seventh Circuit Court of Appeals in Spangler Candy Co. v. Crystal Pure Candy Co., 353 F.2d 641, 645 (7 Cir. 1965):

" * * * the chiseling tactics of predatory and unscrupulous business competitors such as deliberately copying the product, dress and packaging of a successful competitor."

An appropriate order may be submitted.