**CAN AM ENGINEERING CO., Plaintiff,**

v.

**HENDERSON GLASS, INC., Defendant.**

**Civ. No. 83–CV–0339–DT.**

United States District Court, E.D. Michigan, S.D.

Oct. 28, 1985.

As Amended Dec. 16, 1985.

---

Arnold S. Weintraub, Basile, Weintraub & Hanlon, P.C., Troy, Mich., for plaintiff.

Jerome A. Galante, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pederson, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, Senior District Judge.

This is an action for damages under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), arising out of the distribution of a price list advertisement or flyer for various automotive wire wheel covers sold by Defendant, Henderson Glass, in January of 1983, which contained a photograph of a wire wheel cover manufactured and sold by Plaintiff, Can-Am Engineering Co. The wire wheel cover in question has a central hub with a seven-sided polygon configuration and a rectangular box inside the poly-

gon with crossed Canadian and American flags.

Plaintiff's three count complaint filed in January of 1983, alleged infringement of common law trade mark rights and unfair competition, in addition to the claimed violation of Section 43(a) of the Lanham Act. In its complaint, Plaintiff asserted that the seven-sided hub was distinctively associated with Can-Am as a producer of wire wheel covers.

This matter was brought on for trial on March 5, 1985, at which time Plaintiff voluntarily abandoned its claim for common law trademark infringement and unfair competition. Plaintiff proceeded to trial solely on the alleged violation of Section 43(a) of the Lanham Act.

The facts in the present case, as adduced at trial before this Court sitting without a jury, are straightforward and largely undisputed. Plaintiff, Can-Am Engineering, sells replacement wire wheel covers for automobiles on the wholesale market which are specially manufactured for Plaintiff by ITT Thompson, utilizing dies owned by Plaintiff, Can-Am Engineering (Testimony, Michael Bunnell)[1]. The wheel covers sold by Can-Am which form the basis of this dispute are designated throughout the industry as "aftermarket wheel covers." Such wheel covers are used as replacements for wheel covers originally sold by automobile manufacturers with a new automobile and are generally less expensive than "original equipment manufacture" wheel covers (OEMs) (Testimony, Bunnell). Facsimiles of automobile design emblems are sold as decals to be placed in the center of an after-market wheel cover to make them appear to be original equipment covers (Carlton Ostdiek).

The Defendant, Henderson Glass, is principally involved in the "insurance replacement business," whereby an insurance company refers an insured to Henderson for automotive repairs or replacement parts and the insurance company is directly billed for any such work. Henderson is also involved in wholesale and retail sales of automobile accessory parts, automotive glass products, and commercial and residential glass products. However, seventy-five to eighty percent of Henderson's business involves insurance replacement (Ostdiek). Of Defendant's total 1983 sales, only 2–2.2% involved wire wheel cover replacements (Ostdiek). In 1982 and 1983, Henderson Glass operated sixteen branch stores, all of which were located in Michigan. It is undisputed that Henderson carried for sale both original equipment manufacture (OEM) wire wheel covers and after-market wire wheel covers in its branch stores which were purchased from Henderson's central warehouse (Ostdiek). Defendant purchased and stocked after-market wire wheel covers from a competitor of Plaintiff, Norris Industries (Ostdiek).

Can-Am Engineering Co. broke into the business of after-market wire wheel covers in December of 1982 when it received its first shipment of wire wheel covers with the seven-sided hub from ITT Thompson. The seven-sided wire wheel cover in question was first conceptualized by Can-Am in 1981 and prototypes were made some time thereafter. Can-Am completed a promotional brochure in July of 1982, which included a color photograph of a series of the Can-Am wire wheel covers that appeared to be in motion and specifically displayed the seven-sided hub now at issue in this case (Plaintiff's Exhibit 2). The brochure also displayed Can-Am Engineering Co.'s name in large letters and indicated that the wire wheel cover was "OEM Quality" and "meets all OEM specifications."[2] Prototypes of Plaintiff's seven-sided wire wheel cover were displayed at a trade show in October of 1983 and approximately one

---

1. The testimony of the relevant witnesses or exhibits will be referred to in parenthesis throughout this opinion.

2. Although the Defendant disputed whether the designation "OEM Quality" referred to an after-market wire wheel cover or an original equipment manufacture wheel cover, this Court finds that such a designation clearly refers to only an after-market wheel cover.

thousand of Can-Am's brochures were distributed at that time (Bunnell).

In the fall of 1982, a Can-Am salesperson contacted Carlton Ostdiek, who was then the vice-President of Henderson Glass, concerning the possibility of Henderson Glass' carrying Can-Am's wire wheel covers at Defendant's branch stores. Henderson did not purchase any of Plaintiff's wire wheel covers, nor did it ever stock any of Plaintiff's wheel covers for sale in its stores (Ostdiek). Rather, Defendant stocked after-market wire wheel covers manufactured by Plaintiff's competitor, Norris Industries. Can-Am did obtain several accounts in the Detroit area during this time frame, including several insurance glass replacement houses similar to Henderson (Bunnell). Plaintiff's president, Michael Bunnell, contacted a local State Farm insurance agent, Nicholas George, in the fall of 1982, to ask him to introduce the Can-Am seven-sided wheel cover to his customers.[3] However, Can-Am never made any direct mailings to insurance companies to advertise its wire wheel covers in 1983, aside from one East coast insurance company (Bunnell).[4] Although Plaintiff claimed it advertised the wire wheel covers in trade magazines, the exact dates and frequency of such advertisements are unclear from the evidence presented at trial.

Sometime in the fall of 1982, Carlton Ostdiek of Henderson Glass received Can-Am's brochure which depicted Plaintiff's seven-sided wire wheel cover shown in Plaintiff's exhibit 3 (Ostdiek).[5] Ostdiek gave the brochure to Trish Perez-Fresard, who was in charge of Defendant's advertising, to put in Henderson's advertising file (Ostdiek). An advertising file was maintained by Defendant to accumulate general ideas for artistic design to be used in Defendant's advertising flyers (Perez-Fresard). Henderson's promotional activities generally consisted of one page photo-copied flyers advertising various special sales of the automotive products carried by Defendant for sale in its branch stores. During the time in question, the photo copied advertising flyers were laid out by Defendant's employee, Trish Perez-Fresard, and generally reviewed by Carlton Ostdiek before they were distributed (Ostdiek) (Perez-Fresard). Once the flyers were photo copied, they were mailed to various insurance agencies in the Detroit area and the balance were placed on the counters of Henderson's sixteen branch stores for its retail customers. The yearly total advertising budget for Henderson Glass in 1982 and 1983 was less than $500.

In December of 1982, Henderson Glass decided to promote the sale of OEM wire

---

**3.** Exactly what was meant by introducing the Can-Am wheel cover to its customers is unclear from the evidence. No evidence was introduced to explain whether such insurance agents would tell their insureds to purchase Can-Am products when the insured's original equipment wheel cover was stolen.

**4.** The vice-president and fifty percent shareholder in Can-Am, Barry Miller, testified that after the alleged violation of the Lanham Act in January of 1983, Miller made numerous advertising and telephone contacts including contacting various insurance companies in an effort to penetrate the market for replacement wheel covers. There was no evidence presented at trial, however, that advertising or direct calls of any significant amount were made by Plaintiff prior to the time when Defendant sent out the advertising flyer containing a photograph of Plaintiff's wheel cover.

**5.** Plaintiff placed great significance at trial upon the disputed factual question of whether Defendant's agent, Trish Perez-Fresard called Can-Am prior to Henderson's January 1983 advertis-

ing flyer looking for a photograph of Plaintiff's seven-sided wheel cover. Apparently Plaintiff seemed to believe that such a deliberate and willful act by Defendant's agent was relevant to the outcome of this case. The law is clear, however, that intent to deceive need not be established to prevail under Section 43(a). *See Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir.1980); *Ames Publishing Co. v. Walker Davis Publications, Inc.,* 372 F.Supp. 1, 11 (E.D.Pa.1974); *Parkway Baking Co. v. Friehofer Baking Co.,* 255 F.2d 641, 648 (3d Cir.1958). To the extent that intent may be relevant, this Court finds that Defendant, acting through its agent, Perez-Fresard, did not act with intent to deceive Defendant's customers. Although Perez-Fresard admits she did put the photograph in Defendant's ad knowingly and intentionally, the Court is convinced that it was not done with any malicious intent to deceive customers by leading them to believe that Defendant was selling the wheel cover pictured on Defendant's price list for OEM wheel covers.

wheel covers (Ostdiek). Trish Perez-Fresard was instructed by Ostdiek to prepare a flyer listing the prices for General Motors accessory package wire wheel covers, or OEMs, at special prices on a rush basis (Ostdiek) (Perez-Fresard). It is undisputed that in preparing such a flyer, Perez-Fresard intentionally included a reproduction of the Can-Am photograph of its seven-sided wire wheel cover which appeared in Can-Am's brochure in a rectangular space on the flyer below the prices listed for OEM wire wheel covers for some thirty-two different models of cars (Plaintiff's Exhibit 3). Perez-Fresard needed a photograph of a wire wheel cover as a graphic illustration of the products being offered by Defendant for sale and chose the Can-Am photograph to fill that space. A General Motors decal was placed over the center of the hub covering the rectangular box and crossed flags on the Can-Am wheel cover (Ostdiek). Sometime prior to photo copying the price list flyer, the decal fell off or was removed. However, some glue residue remained on the layout sheet causing the distortion of Can-Am's crossed flags in the final photo copied flyers (Ostdiek). The seven-sided polygon configuration on the hub, claimed by Plaintiff to have been misappropriated by Defendant, remained clearly visible.

Approximately 3,000 photo copies of such flyer were prepared, of which some 1,273 copies were mailed by Defendant to the insurance companies and agencies on Defendant's mailing list on approximately January 5, 6, and 7 of 1983, along with several other photo copied flyers for other specials offered by Defendant (Perez-Fresard). The balance of the 3,000 copies, approximately 1,727, were taken to Henderson's sixteen branch stores for over-the-counter distribution and occasional sales calls (Perez-Fresard). Within several days after such distribution, Can-Am's attorney notified Carlton Ostdiek of Henderson of the alleged wrongful use of Plaintiff's photograph of its seven-sided wire wheel cover. Ostdiek instructed all employees of the company to return any copies of the advertising flyer remaining at Defendant's branch stores (Ostdiek) (Defendant's Exhibit 14). Of the approximately 1,700 copies delivered to Defendant's branch stores, some 1,543 copies were retrieved and counted by an employee of Defendant, Linda MacDonald (Defendant's Exhibit 5). In addition, on approximately February 10th or 11th of 1983, Henderson Glass prepared and distributed a new price list (Defendant's Exhibit 4), identical in all respects to the original price list, except that it contained a retraction in the space where the photograph of Can-Am's wire wheel cover had originally appeared which read as follows:

NOTICE:

January version of this ad improperly included (in this space) a photograph of a wheel cover by Can-Am Engineering Co. This ad pertains only to G.M. accessory packages, wire wheel covers and to OEM replacement covers. We do not offer the wheel cover by Can-Am Engineering Co. shown in the previous ad.

(Ostdiek) (Linda MacDonald) (Perez-Fresard).

This flyer was distributed in the same manner as the January 1983 flyer (Fresard). In addition, extra copies of the retraction were given to the branch stores and to at least four additional major insurance companies (MacDonald) (Ostdiek).

On January 28, 1983, Plaintiff filed a three count complaint, alleging among other things a violation of 15 U.S.C. § 1125(a) based upon Defendant's use of the photograph in its advertising flyer, seeking both injunctive relief and damages. On that same date, Plaintiff also filed a motion for a preliminary injunction to restrain Defendant's use of Plaintiff's photograph. The parties subsequently entered into an agreement that Defendant would not use in any of its advertising, promoting, or soliciting materials, any of Plaintiff's advertising or promotional material, including any photographs or illustrations of Plaintiff's wheel cover. A stipulation and order to this effect was entered in this Court on April 20, 1983. The parties have agreed that the only issue as to relief remaining in this

matter to be decided by this Court is the question of monetary damages.

The essence of Plaintiff's claim is that the seven-sided hub configuration on the wire wheel cover is distinctive and that Defendant knowingly and intentionally appropriated and used a photograph of Plaintiff's wire wheel cover to promote the sale of other brands of wheel covers carried by the Defendant. Plaintiff contends that the use of the photograph of Plaintiff's product constitutes either a false representation or a false designation of origin of Defendant's goods prohibited by Section 43(a) of the Lanham Act.

Section 43(a) of the Lanham Act which governs Plaintiff's claim provides in pertinent part:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols, tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

The purpose of Section 43(a) is to protect persons engaged in interstate commerce against unfair competition or fraud and deception that result from false designation of origin or other false representation of Defendant's product.[6] *See Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985); *Kwik-Site Corp.*

*v. Clear View Mfg.*, 758 F.2d 167, 177–78 (6th Cir.1985) (case involving palming off); *WSM, Inc. v. Hilton and Country Shindig Opry Inc.*, 724 F.2d 1320, 1331 (8th Cir. 1984); *Lacoste Alligator, S.A. v. Bluestein's Men's Wear*, 569 F.Supp. 491 (D.C. S.C.1983).

It is now well accepted that misappropriation of advertising is actionable under Section 43(a) of the Lanham Act. *See Vibrant Sales Inc. v. New Body Boutique*, 652 F.2d 299 (2d Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); *Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.*, 543 F.2d 1107 (5th Cir.1976) (palming off); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed. 139 (1976) (reverse passing off); *L'Aiglon Apparel, Inc. v. Lane Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954) (use of photograph of plaintiff's dress to advertise defendant's inferior quality dress actionable under Section 43(a) as false representation); *see generally*, Comment, *The Present Scope of Recovery for Violations Under Section 43(a) of the Lanham Act*, 58 Neb.L.Rev. 159 (1978).

In order for Plaintiff to prevail on its claim of false designation of origin or false representation, Plaintiff must establish by a preponderance of the evidence that Defendant's advertisement was in fact false or created a false impression as to the source of supply, origin, sponsorship, or nature or quality of Defendant's own goods or services. *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir.1982); *Walker-Davis Publications, Inc. v. Penton/IPC, Inc.*, 509 F.Supp. 430, 435 (D.C.Pa.1981); *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405, 408–09 (6th Cir.1963). In this case, there is no question that Defendant's use of the photograph of Plaintiff's seven-sided wire wheel cover was in fact false or at least created a

---

**6.** The Congressional intent in enacting the Lanham Act is clearly set out in the statute, 15 U.S.C. § 1127, which provides in pertinent part: "The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce ... to protect persons engaged in such commerce ... against unfair competition; to prevent fraud and deception...."

false impression as to the origin of the goods advertised for sale by the Defendant. Defendant's advertising flyer depicted a photograph of Can-Am's wire wheel cover, a cover not sold or stocked by the Defendant.

Plaintiff is also required to prove that Can-Am's seven-sided polygon wire wheel cover was non-functional and either inherently distinctive or had acquired secondary meaning. *See e.g. Kwik-Site Corp. v. Clear View Mfg.*, 758 F.2d 167, 178 (6th Cir.1985) (trade dress case); *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981); *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 533 F.Supp. 75, 77 (D.C.Fla.1981); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1219–20 (8th Cir. 1976).

The Court rejects the Plaintiff's contention that it is unnecessary to prove secondary meaning where the plaintiff relies upon the false representation leg of Section 1125(a). Plaintiff's position seems to be that a *per se* violation of Section 1125(a) is established any time a defendant happens to use a photograph of plaintiff's product in its advertising where it cannot deliver the product pictured. The cases upon which Plaintiff relies for this position, including the oft cited Third Circuit case of *L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954), do not address the question of secondary meaning or the elements of a cause of action under Section 1125(a). *See e.g. Bangor-Punta Operations Inc. v. Universal Marine Co.*, 543 F.2d 1107 (5th Cir.1976); *Eberling & Reuss Co. v. International Collectors Guild, Ltd.*, 462 F.Supp. 716 (E.D.Pa.1978); *Matsushita Electric Corp. of America v. Solar Sound Systems, Inc.*, 381 F.Supp. 64 (S.D.N.Y.1974). In fact, the *L'Aiglon Apparel* case specifically concludes that plaintiff's product, a dress, was distinctive and identified or associated in the minds of

the public as plaintiff's dress. 214 F.2d at 650.

Plaintiff also relies upon several trade dress cases which hold that where a defendant copies the trade dress of plaintiff's product, a presumption of secondary meaning and likelihood of confusion is raised. *See E.R. Squibb v. Premo Pharmaceutical*, 195 U.S.P.Q. (D.C.N.Y.1977); *Rolex Watch v. Thalheimer*, 217 U.S.P.Q. 964a (D.C.Cal.1982). This case, however, does not involve copying of the plaintiff's trade dress, but rather is primarily based upon a false representation or designation as to the origin of Defendant's products offered for sale in the advertising flyer. Hence, such cases are distinguishable on their facts.

Finally, this Court notes that Plaintiff cites no authority for the proposition that the use of photographic representation of Plaintiff's product in a price list advertising for sale many different wire wheel covers would necessarily be premised solely on the false representation leg of Section 1125(a). The Court is of the opinion that the actions complained of in this case might equally fall under the false designation leg of the statute. Although Plaintiff failed to clearly articulate the precise nature of its claim under Section 43(a), the gist of the claim appears to rest upon the allegation that the use of Plaintiff's photograph in Defendant's advertising flyer confused consumers and led them to believe that they were purchasing Plaintiff's product when they ordered any one of the thirty-two OEM wire wheel covers on Defendant's price list or that Plaintiff sponsored the products advertised. In other words, whether Plaintiff's claim is premised on false designation or false representation, the allegation is the same—consumers were confused as to the origin of the product they were purchasing due to the false representation on the flyer.

 Plaintiff's seven-sided hub was not a registered trademark at the time Defendant used a photograph of Plaintiff's product, or at any time thereafter.[7] Al-

---

7. The seven-sided hub was registered on the Supplemental register on October 23, 1984. Aside from the fact that registration on the

Supplemental Register does not indicate that the mark in question is distinctive, Plaintiff must establish that its mark acquired secondary

though registration of a mark is not necessary to establish a claim under Section 43(a), Plaintiff still must bring forth evidence to show that the public, because of the name, or mark, assumes that the product comes from a single source. *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 856 (7th Cir.1982); *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 533 F.Supp. 75, 79–82 (S.D.Fla.1981); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 849 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970); *Sterling Products Co. v. Crest Manufacturing Co.,* 314 F.Supp. 204, 212 (E.D.Mich.1970). It is not necessary for the public to be aware of the actual source of the product; it is enough if the public believes that there is a single source. *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d at 856; *Sterling Products Co. v. Crest Manufacturing Co.,* 314 F.Supp. at 211.

█ In the instant case, the Court is of the opinion that although the seven-sided polygon on Plaintiff's wire wheel cover is non-functional, it is neither distinctive, nor had it acquired secondary meaning prior to Defendant's alleged wrongful conduct. The uncontroverted facts at trial revealed that Plaintiff's seven-sided wire wheel cover was first introduced at a trade show in October of 1982, at which time over 1,000 brochures with a photograph of the wheel cover were distributed, presumably to individuals in the industry. There was no evidence introduced at trial that the general public was at the trade show, nor was there any evidence that an advertising campaign had been conducted by Plaintiff prior to Defendant's use of Plaintiff's photograph, either for the benefit of those in the industry or the public. The evidence showed that Plaintiff made sales to two glass houses in the Detroit area in November of 1982, totalling approximately $36,000.00, or 250–300 sets of wire wheel covers. (Barry Miller) (Plaintiff's Exhibit 11). Plaintiff did

not receive any wire wheel covers for delivery to such glass houses from ITT Thompson until December 21, 1982, approximately sixteen days before the price list was first distributed (Defendant's Exhibit 17 shows that Plaintiff received approximately 972 sets from ITT Thompson on December 21, 1982). Plaintiff's only direct evidence offered on secondary meaning was the testimony of an insurance agent, Nicholas George, who stated that he received a copy of Defendant's price list with a photograph of Plaintiff's seven-sided wire wheel cover and immediately recognized it as Plaintiff's wheel cover. The Court, however, gives little weight to George's testimony. The evidence at trial showed that George had an office across the hall from Plaintiff's office at the time in question and that Plaintiff approached George in an effort to get him to promote its wheel cover to his clients. George's recognition of Plaintiff's wheel cover might be representative of other insurance agents, who Plaintiff claims were among the relevant consumers in this case, had Plaintiff promoted its product in a similar manner to the hundreds of other agents in the Detroit area at the time in question. However, the evidence revealed that George was the only such agent contacted prior to the January 1983 price list (Bunnell) (Miller).

Moreover, the short time since Plaintiff's product had first been introduced onto the market in October of 1982, is another factor which points to a conclusion that secondary meaning had not been established at the time in question. *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 533 F.Supp. at 78. Finally, Plaintiff introduced no survey or other evidence to establish that those in the trade, including glass houses who purchased Plaintiff's wire wheel cover, or the actual consumer, recognized Plaintiff's seven-sided hub. The Court concludes that Plaintiff failed to meet its burden of proof that its seven-sid-

---

meaning prior to the date the Defendant commenced using such mark in its advertising. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978). Hence, registra-

tion on the Supplemental Register over a year and a half after the alleged wrongful conduct does not establish secondary meaning in this case.

ed wire wheel cover had acquired secondary meaning.

■ Even if secondary meaning is not required under Section 43(a) where a defendant uses a photograph of another's product to promote the sale of numerous products carried by defendant, this Court finds that Plaintiff failed to establish that the buying public was actually deceived. While a plaintiff only need show a likelihood of confusion where injunctive relief is sought, in order to recover damages in an action under Section 43(a), Plaintiff must present evidence to prove that the public was actually deceived. *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1266-67 (6th Cir.1985) (proof actual confusion not necessary to obtain injunctive relief under the Lanham Act); *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir.1982); *Skil Corp. v. Rockwell International Corp.*, 375 F.Supp. 777 (N.D.Ill.1974). Plaintiff relies upon the case of *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980), for the proposition that Plaintiff need only establish a likelihood of confusion and damage as the result of Defendant's alleged wrongful conduct. Unlike the case at hand, however, *Johnson & Johnson* involved only an action for injunctive relief and does not address the issue of whether actual deception must be proved where a party seeks money damages. Plaintiff set forth no evidence in its Proposed Findings of Fact and Conclusions of Law, nor was the Court able to locate any such evidence, that the buying public was actually deceived. Accordingly, Plaintiff's claim under Section 43(a) must fail.

Because Plaintiff failed to establish the elements necessary for recovery under Section 43(a), the Court need not address the issue of damages.

For the reasons set forth herein, this Court will render judgment in favor of Defendant and against the Plaintiff of no cause for action.