CAN–AM ENGINEERING COMPANY,
Plaintiff-Appellant,

v.

HENDERSON GLASS, INC.,
Defendant-Appellee.

No. 85–1931.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1987.

Decided March 16, 1987.

Arnold S. Weintraub, Basile, Weintraub & Hanlon, Troy, Michigan, Andrew R. Basile, Thomas Dean Helmholdt (argued), Troy, Mich., for plaintiff-appellant.

Robert G. Kamenec (argued), Detroit, Mich., for defendant-appellee.

Before: LIVELY, Chief Judge, JONES and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiff brought an action pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This action followed the unauthorized use of a photograph of plaintiff's product on one of defendant's advertising price lists. Plaintiff claimed injuries flowing from false designation of origin and false description or representation. After a bench trial, the district court found in favor of the defendant. 620 F.Supp. 596 (1985). Upon a consideration of plaintiff's claims of error and a full review of the record, we affirm.

## I.

The facts are not in dispute and can be briefly summarized. Automobile wire wheel covers are a frequently stolen item and consequently are the subject of a large volume of insurance claims. As a result of this, a brisk business is done in furnishing after-market wire wheel covers for replacements.[1] Both Can-Am and Henderson sell after-market wire wheel covers principally to insurance replacement companies.[2] Can-Am just started in the after-market wheel cover business in 1982 when it conceived a product and produced an advertising brochure to promote the product. In the fall of 1982 a Can-Am sales representative called on Henderson Glass soliciting business and left a copy of Can-Am's sales brochure. Henderson purchased no product from Can-Am but rather bought from Norris Industries, a competitor.

In December of 1983, Henderson decided to run a special on General Motor's (GM) OEM wheel covers. The advertising director of Henderson was instructed to put together on a rush basis a flyer listing the prices for the GM wheel covers. The decision was made to depict wheel covers on the flyer, but no picture of the GM wheel covers was available in Henderson's files, and so they used the wheel cover picture from Can-Am's advertising brochure which Henderson had in its files. Since the Can-Am wheel cover had a distinctive logo in the center of its also distinctive seven-sided wheel cover hub, a GM decal was pasted over the logo prior to copying. Somehow the decal fell off, leaving a glue residue and a distorted logo which was neither that of Can-Am nor GM. The seven-sided hub was clearly visible, however.

When completed, the price list flyer was mailed by Henderson to the insurance companies and other agencies on its mailing list (1,273 copies) and distributed to Henderson's 16 branch stores (1,757 copies). Very shortly after this distribution, Henderson received a telephone call from Can-Am's attorney complaining of the use of its wheel cover in the Henderson flyer. Henderson immediately called back all of

---

1. After-market wire wheel covers are used as replacements for wire wheel covers originally sold by automobile manufacturers with a new automobile and are generally cheaper than original equipment manufacturer's (OEM) wire wheel covers.

2. Henderson was primarily in the business of being an insurance replacement company. It was new to the after-market wire wheel cover sales business as was Can-Am. Henderson, unlike Can-Am, also marketed OEM wheel covers.

the flyer copies sent to its branch managers. Since it was not feasible to try and retrieve all of the copies sent out to Henderson's mailing list customers, Henderson sent out a new price list flyer which contained a retraction in the place where the wheel cover picture previously appeared. The retraction read:

"NOTICE:
JANUARY VERSION OF THIS AD IMPROPERLY INCLUDED (IN THIS SPACE) A PHOTOGRAPH OF A WIRE COVER BY CAN–AM ENGINEERING CO. THIS AD PERTAINS ONLY TO G.M. ACCESSORY PACKAGES, WIRE WHEEL COVERS AND TO OEM REPLACEMENT COVERS. WE DO NOT OFFER THE WHEEL COVER BY CAN–AM ENGINEERING CO. SHOWN IN THE PREVIOUS AD."

Despite these efforts on the part of Henderson, Can-Am filed suit. Immediately after suit was entered, Henderson agreed to a voluntary consent order that it would not use any photos of Can-Am's products. The suit continued, however, with Can-Am seeking only money damages.

## II.

On appeal Can-Am raises a plethora of issues involving either alleged procedural irregularities at trial or the nature of the proofs required in a Lanham Act suit. Since we find the procedural issues raised to be wholly without merit, we address them first.

## A. Expert testimony.

During this bench trial James J. McElroy, the marketing director for Norris Industries, testified for the defendant. It is plaintiff's position that this 1976 graduate of the University of Michigan with a master's degree in business administration, specializing in marketing, was not qualified to testify as an expert. This is an issue left to the sound discretion of the trial judge and particularly so in a bench trial. We find no abuse of discretion in Judge Freeman's decision to let McElroy testify.[3]

## B. The special record testimony of Barry Miller.

At trial a special record was made of the testimony of one of plaintiff's witnesses, Barry Miller. This testimony concerned a telephone call allegedly made by the director of advertising at Henderson to Can-Am. The alleged purpose of the call was to obtain an original of the color brochure showing Can-Am's wheel covers. Plaintiff argues that this testimony is important as it bears on the intent of Henderson.

The error asserted on this issue is that the trial judge failed to rule on whether the special record testimony was admissible or not. We find it unnecessary in resolving this issue to determine whether Judge Freeman admitted this testimony or not. In fact, in a bench trial, a separate record does not serve the same purposes as it does in a jury trial. In a bench trial the judge, unlike the jury in a jury trial, hears the testimony whether it is admitted or not. The presumption, of course, is that the trial judge has the ability to disregard the testimony if it is found to be inadmissible. Since the trial court's opinion does not reference this testimony one way or another, we can only conclude that the trial judge found it inconsequential to his decision. We certainly would characterize the testimony as irrelevant or cumulative. Henderson from the outset admitted that

---

**3.** Plaintiff also claims McElroy was not listed as an expert on the final pretrial order and was allowed to testify as to a Norris survey in which he did not participate. Plaintiff had the responsibility under the local rules to prepare the final pretrial order. That order contained a reference to defendant calling a witness "from Norris Industries." If a plaintiff accepts this very general description it cannot be heard to complain later of surprise. The time to eliminate this type of vagueness is when the pretrial order is entered—not at trial. As to the survey, we note that the Federal Rules of Evidence allow an expert to base his opinion on materials that are not themselves admissible into evidence. Fed.R.Evid. 703. Even if McElroy's use of the survey went beyond the point authorized by the rule, we find any error harmless particularly in the context of a bench trial and in light of the fact that plaintiff in no way sets forth how he was prejudiced by this testimony.

they intentionally used the Can-Am photo. Miller's testimony only supported that which was already admitted.[4] Even if we construe the record to include Miller's testimony it does not change the outcome.

### C. Plaintiff's sales records.

■ This issue also involves testimony of Mr. Miller offered by plaintiff. Mr. Miller was asked to testify as to certain sales figures. Defendant objected primarily because the records were neither present in court nor offered into evidence. Although defendant did not specifically reference Rule 1002 of the Federal Rules of Evidence—this rule clearly makes defendant's objection appropriate.[5] The court did not, as suggested by plaintiff, improperly reopen discovery to allow defendant to see the records, but rather went above and beyond to salvage this testimony for the *plaintiff.* Clearly there was no error in Judge Freeman's proceeding in this manner.

### III.

We now turn to the substantive issues raised in this appeal. Although the parties each offer their own version of the issues presented on appeal, they can all be consolidated and summarized by the general inquiry as to whether the Lanham Act, 15 U.S.C. § 1125(a), affords any basis for relief under the facts presented here.[6]

Section 43(a) of the Lanham Act, which governs plaintiff's claim, provides in pertinent part:

§ 1125. False designations of origin and false descriptions forbidden

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Based upon this section of the Lanham Act, it is plaintiff's contentions that its wheel hub with its heptagonal configuration is distinctive and that defendant's use of a photograph of this wheel cover constitutes either a false designation of origin or a false representation. Although the statutory language of § 43(a) is brief and seemingly unambiguous, judicial gloss of considerable significance has been placed on this section.

■ Section 43(a) contains two separate prohibitions: one against false designation of origin and one against false representation or description. In false designation of origin cases, a plaintiff can only succeed in an action for money damages if he can show that the product features allegedly copied are nonfunctional *and* have acquired secondary meaning in the market place. *Vibrant Sales Inc. v. New Body Boutique, Inc.,* 652 F.2d 299 (2nd Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257,

**4.** We note in passing that plaintiff's argument on this issue misses the mark in any event. Plaintiff argues hearsay issues relative to Miller's testimony but the evidentiary issue initially facing the court was *authentication* not hearsay.

**5.** Requirement of Original

To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.

Fed.R.Evid. 1002.

**6.** Plaintiff's original complaint also contained claims for common law trademark infringement and unfair competition which were voluntarily abandoned at the time of trial.

71 L.Ed.2d 448 (1982). Although plaintiff's seven-sided wheel hub is nonfunctional, as a brand new product it has acquired no secondary meaning. Consequently, plaintiff has no Lanham Act action for false designation of origin. Plaintiff is thus left with its false representation or false description argument.

■ It is not open to question that "one who uses a photograph of his competitor's unpatented and untrademarked product to advertise his own wares *may* be guilty of false representation if the product pictured is not identical to one he is prepared to deliver." *Vibrant* 652 F.2d at 304 (emphasis added). In stating this proposition of law the *Vibrant* court cited to what they referred to as the "seminal decision" in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3rd Cir.1954). In *L'Aiglon*, the court summarized the operative facts as follows:

> The present complaint alleges that plaintiff created and alone sold to the retail trade throughout the country a certain distinctively styled dress. To advertise this dress plaintiff published pictures of it, together with its price, $17.95, in advertisements in leading newspapers and in some two million individual mailing pieces distributed through retailers. In this way the picture and price of this dress became associated in the minds of many readers and identified as plaintiff's $17.95 dress.
>
> It is further alleged that, at about the same time, defendant was offering for sale through mail order and otherwise in interstate commerce a dress which in fact was much inferior to plaintiff's in quality and notably different in appearance. In this connection defendant published under its name in a magazine of national circulation a display advertisement worded and designed to promote the mail order sale of its dress at a stated price of $6.95, but showing as the most prominent feature of the advertisement an actual photographic reproduction of plaintiff's dress, thus fraudulent-

ly represented as the article defendant was selling for $6.95.

*Id.* at 650.

The difference between the egregriousness of the *L'Aiglon* facts and those presented here can only be characterized as global. Unlike the plaintiff in *L'Aiglon*, Can-Am had no market identity for anyone to trade on. Second, the product being offered by Henderson was General Motor's OEM wheel covers which are of equal if not greater quality than the after-market product of Can-Am. It simply defies logic and reason to suggest that one would try to market an established product like a GM wheel cover by depicting a product no one knew or had ever heard of. The whole purpose of the Henderson flyer was to let prospective purchasers know that there was an attractive sale price on an established product. It would have been counter-productive to display a different product not generally known.

Last, and perhaps most important, is that we are dealing here with the aftermath of a mistake in judgment and a short-cut taken by the advertising director of Henderson. We are *not* dealing with any attempted misappropriation of the product or goodwill of a competitor. Henderson wanted a picture to dress up its ad and Can-Am's photo which gave the feeling of wheel covers in motion apparently filled the bill. Plaintiff confuses the intentional use of the photo with the kind of intent to misrepresent which is the cornerstone of a money damage action. We note in this regard the swift and effective remedial action Henderson undertook immediately upon being notified of its error. Under such circumstances we find no false representation which is actionable under the Lanham Act.

■ Since the district court found no liability it did not consider the issue of damages. Contrary to plaintiff's assertion, however, it did make a damage finding when it concluded that since there was no evidence to prove "that the public was actually deceived" there could be no damages. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261 (6th Cir.1985). We would add to this finding of the district court by indicating that "a plaintiff who

establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled to only such damages as were caused by the violation." *Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 771 (2nd Cir.1984) (citations omitted). "Although a court may engage in some degree of speculation in computing the *amount* of damages ... causation must first be established." *Id.* at 771.

Plaintiff's product was so new that it had no meaningful sales records to indicate it had been damaged by the action of Henderson. Although Can-Am attempted to show one or two slow months contemporaneous with the release of the Henderson flyer, this may well be due to GM's OEM product being offered at an attractive price in competition with Can-Am's after-market product. If anything, Can-Am received more free publicity for its new product out of this whole episode than anything they had done on their own prior to this time.

### IV.

Can-Am raises a number of other issues relating to secondary meaning, some of which ask this court to extend Lanham Act jurisdiction into new areas. Since we find no Lanham Act coverage on these specific facts we find it unnecessary to consider these other arguments. We note in passing, however, that were we inclined to consider blazing new Lanham Act trails we certainly would not use this fragile fact situation as a vehicle.

Although we find this to be ill-conceived "pound of flesh" litigation, we do note that Can-Am does have one legitimate complaint. Henderson did use one of Can-Am's photos which Can-Am had spent good money on developing. We pass no judgment on whether there is some other cause of action, state or federal, of which plaintiff may avail itself in this regard. We limit our holding here to finding, as did the district court, no cause of action under the Lanham Act for these facts.

AFFIRMED.